# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| LATANYA D. BLEVINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 4:15CV496 HEA |
| | ) | |
| AT&T SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgement, [Doc. No. 66]. Plaintiff opposes the Motion. For the reasons set forth below, the Motion is granted.

### Facts and Background

Plaintiff worked for AT&T Services, Inc. ("AT&T" or "Defendant") from 2004-2012. She worked at a call center in Olivette, Missouri. Plaintiff's first position at AT&T was a service representative, and then she became a senior consultant. A senior consultant performs the following tasks: 1) handling customer calls regarding sales and service, 2) responding to customer requests or inquiries about services, products, and billing, 3) making notations via computer terminal, 4) utilizing different mechanized systems to initiate and complete service orders, 5) working to meet revenue goals, service commitments, and other deadlines, and 6)

wearing a headset. A senior consultant in Plaintiff's department would talk to the customer and type at the same time. In a typical day, a senior consultant would talk to a customer through a headset and type all day long.

Plaintiff was diagnosed with multiple sclerosis (MS) in 2009. In December of 2011, Plaintiff went on short-term disability. At the time, she was having headaches, swollen hands, numbness, hearing loss, trouble with fine motor skills, and fatigue. There was concern that these symptoms were related to typing and use of a headset.

In 2012, Blevins sought accommodations for permanent restrictions, which were 1) unable to use a headset, 2) unable to type, other than to sign in and out of the computer, 3) need to sit or stand at will, and 4) inability to work over 40 hours per week.

While Plaintiff was on short-term disability, there was a conference call which included members of management, HR, Plaintiff, and Plaintiff's union representative to discuss Plaintiff's restrictions and possible accommodations. At the time, the restrictions were no headset, and no typing other than to log on and log off of the computer. There were no disagreements about the restrictions. On the phone call, Plaintiff was asked what she thinks could happen that would allow her to do her job. Plaintiff's union representative, Pamela Farrell, made a recommendation for a voice-activated system. A representative of AT&T's HR

department told Plaintiff and her union representative that AT&T would look into such a system – including the cost and whether it would affect customer privacy.

Defendant explored the possibility of using a voice-activated system for Plaintiff's computer to accommodate Plaintiff's inability to type (other than to log in and log out), but found that there was no system that would be feasible at the call center because 1) all voice-activated systems at the time required some typing, and 2) due to the multiple systems used by a senior consultant/service representative, there was no voice-activated system that would be compatible with AT&T's multiple systems. AT&T Services, Inc. explored the possibility of allowing Ms. Blevins to use a speakerphone instead of a headset, but had privacy concerns with the speakerphone.

There was another phone call which included Plaintiff, her union representative, and an HR representative to discuss Plaintiff's restrictions and possible accommodations. The call participants discussed voice-activated systems. The HR representative said that even the best voice-activated products require some typing. Plaintiff does not know whether the best voice-activated systems require some typing. Plaintiff's union representative, Pamela Ferrell, testified that she had no reason to question that the specific voice-activated software she proposed required some typing. She also testified that she had seen some software that eliminated typing.

Plaintiff does not use a voice-activated computer system. She does not know whether a voice-activated system would be able to access the different AT&T systems from voice commands and be able to automatically type in customer information given.

Plaintiff's department at the call center told her they could not accommodate her restrictions of not being able to type (other than to log in and out) and not being able to use a headset.

Plaintiff began the process of looking for other open jobs at AT&T.  Plaintiff was looking for a clerical job.

Plaintiff's union representative gave her a binder with jobs in St. Louis. Based on this binder of jobs, Plaintiff applied for some jobs.  Plaintiff does not remember the jobs for which she applied..

At her deposition, Plaintiff described a job at AT&T that involved filing hard copy papers and printing paperwork. She does not know whether that was an open position. Plaintiff filled out two documents tilted "job vacancy request." She signed this document on July 26, 2012. She listed desired job titles, and listed interest in Missouri and the St. Louis metropolitan area. In the two forms, she identified a total of six job positions she was interested in if there were any openings: central office clerk, business services instructor, S-2 clerical, supplies

attendant, S-1 clerical, and SS-2 clerical. Plaintiff does not recall filling out any documents where she requested a job anywhere other than the St. Louis metro area.

Pamela Ferrell, Plaintiff's union representative, assisted Plaintiff with the job vacancy request (JVR) form. After an employee fills out a job vacancy request listing positions in which he or she is interested, if a job becomes available, the employee is placed on a candidacy list and will be considered for that position.

Plaintiff was contacted to undergo testing for a premises technician position, but did not pass.

Plaintiff was unable to secure an open position at AT&T for which she was qualified, with or without an accommodation.

On August 21, 2012, Plaintiff received a letter from AT&T's Integrated Disability Service Center (IDSC). It notified Plaintiff that her short-term disability payments would expire December 9, 2012, and that she may be eligible for long-term disability benefits as of December 10, 2012. The letter explained that to qualify for long-term disability benefits, an individual must be totally disabled as defined by the plan. Plaintiff filled out and signed an application for long-term disability benefits through AT&T on August 28, 2012. Plaintiff understood that she was filling out and signing an application for long-term disability benefits from AT&T.   Nobody forced Plaintiff to apply for long-term disability payments from

AT&T.  Plaintiff understood that the long-term disability application was a voluntary process. She had a choice about whether to apply or not.

Plaintiff's request for long-term disability benefits was approved. Her short-term disability benefits ended on December 9, 2012 and her long-term disability benefits began December 10, 2012. She received her first long-term disability benefit check at the end of December, 2012. Under the long-term disability plan, Plaintiff is provided 50 percent earnings protection.

Plaintiff must complete a questionnaire every year for AT&T's long-term disability benefit program. While on long-term disability, the IDSC continues to monitor Plaintiff's medical condition. Plaintiff has provided updates and information to the IDSC for over four years.

On August 15, 2013, Plaintiff filled out and signed the first long-term disability questionnaire for AT&T after her original application for long-term disability.  On the questionnaire, Plaintiff was asked "in your own words tell us why you cannot work in your own or any occupation." Plaintiff responded: "The reason I can't work is because stress triggers MS. I don't want to have MS attack that puts me in an immobile state."   At her deposition, Plaintiff explained that this answer did not encompass all of the health challenges that she is facing.  Plaintiff stated, "It shouldn't have just been one thing pinpointed. It should have been the overall health issue, period. It should have been my health, my life, my—you

know, those things that I said earlier. But at this particular time I was just sick and just wanted to do what I needed to do to get better. So that's why the statement went to oh, I'm stressed. But it was more than that."

On December 15, 2014, Plaintiff filled out and signed another questionnaire regarding her long-term disability benefits. On the questionnaire, Plaintiff was asked "in your own words tell us why you cannot work in your own or any occupation." Plaintiff responded: "I am sick and lately my symptoms have increased. I don't want to have any relapses if avoidable."

Plaintiff is currently receiving long-term disability benefits through AT&T. Other than a "little period" where Plaintiff did not receive short-term disability benefits due to the delay in obtaining complete medical records (which she was subsequently paid for), Plaintiff has continuously been getting either short-term or long-term disability payments from AT&T from 2011 to the present.

The supervisor's manual applicable during Plaintiff's employment at AT&T states that "employees who leave the service of the company immediately following the expiration of sickness disability benefits are not entitled to payment in lieu of vacation." Plaintiff does not claim that this policy was violated.

Plaintiff never waived short-term or long-term disability payments. Plaintiff has been paid far more in long-term disability payments than the value of four weeks of vacation.

Plaintiff applied to the Social Security Administration (SSA) for disability insurance benefits under Title II of the Social Security Act on October 16, 2012, alleging a disability since December 4, 2011. Plaintiff's application for social security disability benefits was completed on December 5, 2012. *Id.* at p. 4. In her application, Plaintiff claimed: "I became unable to work because of my disabling condition on December 4, 2011" and "I am still disabled." In Plaintiff's application with the SSA, Plaintiff verified:

> I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under federal law by fine, imprisonment or both. I affirm that all information I have given in connection with this claim is true.

In Plaintiff's Function Report dated January 14, 2013, which was part of her Social Security disability application, Plaintiff was asked "What were you able to do before your illnesses, injuries, or conditions that you can't do now?" Plaintiff's answer was "I can no longer work, run for exercise, type, or multitask." In describing shopping in Plaintiff's Function Report dated January 14, 2013, which was part of her Social Security disability application, she stated:

> At times, I lean on the cart for support because walking is more difficult. I often sit down and take a break when I shop because walking and standing is difficult. I rely on a list to remind me what to buy. I carry the light groceries into the house after I come home. I rely on my family to carry in the heavier grocery bags.

In Plaintiff's Function Report dated January 14, 2013, Plaintiff was asked to check items that her illnesses, injuries, or conditions affect. Plaintiff marked lifting, squatting, standing, reaching, walking, sitting, kneeling, hearing, stair climbing, memory, completing tasks, following instructions, and using hands. In Plartintiff's Function Report dated January 14, 2013, which was part of her Social Security disability application, she noted the following about her memory, "At times, I have trouble recalling information. I forget recent conversations and instructions. I rely on reminders to remember appointments and important tasks."

In the same report she noted the following about her ability to complete tasks: "I have trouble multitasking because I can only focus on one task at a time. It takes me longer to finish tasks because of fatigue. I often take breaks before I can finish tasks."

She also noted the following about her ability to use her hands: "I have trouble using my hands due to pain, numbness, and swelling in my hands. My ability to write, type, and handle objects is much more limited now."

In Plaintiff's Function Report dated January 14, 2013, she noted the following about her ability to handle stress: "whenever I feel stressed, I have an attack, which causes my physical symptoms to worsen. I experience increased pain, numbness, and fatigue. I try to avoid as much stress as I can to avoid these attacks."

In Plaintiff's Function Report dated January 14, 2013, she noted the following about her ability to dress: "I sit down to get dressed to avoid standing. I have difficulty using my hands to button buttons, snap snaps, and to zip zippers. I wear comfortable clothes that are easier to get on and off."

In Plaintiff's Disability Report, she further described her condition as follows:

> I suffer with constant pain throughout my muscles and joints. The pain is most severe in my hands and knees. I experience pain in my frontal lobe, which radiates into my ears. Due to the shooting pain, I now suffer with hearing loss. I experience frequent muscle spasms in my neck. I experience frequent periods of lightheadedness and dizziness with increased fatigue. I experience frequent weakness and excessive fatigue. I have constant tingling and numbness in my hands and feet. I have constant swelling in my hands. I have limited range of motion and weakness in my hands and feet.

On November 13, 2013, the Social Security Administration found that Plaintiff was disabled within the meaning of the Social Security Act since December 4, 2011, and Plaintiff met the insured status requirements of the Social Security Act on December 4, 2011. The SSA found that a significant number of jobs have not existed for the claimant in the national economy since December 4, 2011. The SSA found that Plaintiff's "limitations in sitting, standing, and walking so narrow the range of work she might perform that a finding of disabled is appropriate within the framework of this rule."

In the SSA's Findings of Fact and Conclusions of Law, dated November 13, 2013, the SSA noted:

The claimant [Plaintiff] stated that she has been unable to work because of joint and muscle pain; numbness and a tingling sensation about her feet; pain, numbness and swelling about her hands; fatigue and weakness. She asserted that she has been unable to stand, walk or sit for a prolonged period and that she has difficulty using her hands. She also asserted she [sic] that she has difficulty lifting objects, reaching, squatting, kneeling and climbing stairs, as well as remembering things. She noted that there are times when [she] spends most of her day lying down.

Plaintiff is obligated to report certain changes to the Social Security Administration, including if her condition improves or she returns to work (as an employee or self-employed) regardless of the amount of earnings. Plaintiff has never reported changes to the Social Security Administration indicating that her condition improved or she returned to work.

Plaintiff is currently receiving social security disability benefits through the federal government.

All of Plaintiff's doctors agree that she should be eligible for long-term disability benefits and social security disability benefits.

Plaintiff filed a charge of discrimination with the EEOC on June 27, 2012. Plaintiff was aware of filing an EEOC charge on June 27, 2012. She is the one who went to the EEOC.

On July 19, 2012, Plaintiff filed a Voluntary Petition in the United States Bankruptcy Court, Eastern District of Missouri, Case No. 12-46957.  In the Statement of Financial Affairs, Plaintiff was asked to "List all suits and administrative proceedings to which the debtor is or was a party within one year

immediately preceding the filing of this bankruptcy case." Plaintiff's answer was "none." Plaintiff signed the Statement of Financial Affairs under penalty of perjury. On July 19, 2012, Plaintiff signed a lien statement of debtor as part of her bankruptcy case. The lien statement of debtor stated:

> I ask this Court to calculate my disposable income based on a rate of 13.05 per hour at 40 hours per week rather than the calculations as set forth in my B22 for the reason that my chronic health conditions make it unreasonable to conclude that I will return to full-time employment at a rate of pay of 26.10.

Plaintiff testified this statement was accurate.

The bankruptcy plan in Plaintiff's bankruptcy claim (Case No. 12-46957) was confirmed on October 2, 2012. Plaintiff's bankruptcy case was closed on December 9, 2013.

Plaintiff filed this lawsuit on March 19, 2015. She was *pro se*. Plaintiff's case was based on the EEOC charge filed in June of 2012.

Defendant filed a Motion for Partial Dismissal and Answer on May 21, 2015. On June 4, 2015, Plaintiff filed a Motion for Extension of Time to respond to Defendant's pleadings. In that Motion, Plaintiff stated:

> Plaintiff has been unable to adequately respond to Defendant's aforementioned motions due to her occasional relapse in having to cope with her debilitating disease of Multiple Sclerosis, which renders her to suffer from fatigue, numbness and tingling in the hands and feet, and severe headaches, along with the ringing of her ears, which impairs plaintiff's physical abilities and cognitive thinking.

On August 25, 2015, Plaintiff filed a second Motion for Extension of Time to respond to Defendant's pleadings. In this Motion, Plaintiff stated:

> …she has continuously suffered from physical fatigue, numbness and tingling in the hands and feet, and severe headaches, along with the ringing of her ears, caused by her disease from which she is unable to adequately prosecute her case against Defendant.

Plaintiff testified this statement was accurate when she wrote it, and is still accurate.

On August 25, 2015, Plaintiff filed and signed a Motion for Appointment of Counsel for Plaintiff's Physical Incapacitation. This Motion states:

> Plaintiff has continuously suffered from physical fatigue, numbness and tingling in the hands and feet, and severe headaches, along with the ringing of her ears, due to her disease, for which she is under continuous medical care.

The Motion further stated, "[t]o present date, plaintiff has been physically incapacitated to adequately and diligently prosecute her case against Defendant." Plaintiff attached to this Motion a letter from her doctor, which stated that Plaintiff carries the diagnosis of MS and has "symptoms of fatigue, hearing loss, ringing in the ears, anxiety, extremity weakness, and numbness and tingling in her extremities. Latanya reports an increase in these symptoms beginning in March, 2015."

On July 19, 2016, Plaintiff filed and signed a Motion for Appointment of Counsel for Plaintiff's Physical Incapacitation. This Motion states:

Since having filed this case against Defendants, Plaintiff has continuously suffered from physical fatigue, numbness and tingling in the hands and feet, and severe headaches, along with the ringing of her ears, due to her disease, for which she is under continuous medical care.

Plaintiff further noted "[p]laintiff has been physically incapacitated to adequately and diligently prosecute her case against Defendant." Plaintiff attached to this Motion a letter from her doctor dated July 6, 2016, which stated that Plaintiff carries the diagnosis of MS and has "symptoms of fatigue, hearing loss, ringing in the ears, anxiety, extremity weakness, and numbness and tingling in her extremities. Latanya reports an increase in these symptoms beginning in March, 2015". Plaintiff attached another letter from her doctor dated July 12, 2016, which stated that Latanya Blevins "has a chronic medical condition that causes extreme fatigue which is worsened under stress. Due to the strain this case has placed on her while she has been attempting to manage the case herself, she feels her medical condition has started to worsen. As a result, she should be given a court appointed attorney so her medical condition is not exacerbated further."

This Court granted Plaintiff's Motion to Appoint Counsel on July 26, 2017.

Since going on long-term disability with AT&T in 2012, Plaintiff has not been working. Since 2012, Plaintiff's doctor has not given her permission to go back to work. Plaintiff's doctors have not released her to work. She has not been cleared to work since August 21, 2012. Plaintiff explained that her doctors consider a number of factors before they could release her back into the workforce,

and Plaintiff explained that her doctors "understand if I get into the wrong thing or go the wrong way that it can cause me my life." Plaintiff has not had a discussion with her doctors about what accommodations she may need to re-enter the workforce.

Following the advice of her doctors, Plaintiff did not seek to find employment after her employment with AT&T. Plaintiff has not applied for any jobs since 2012. Plaintiff testified this was because her doctor told her, "…until I tell you you can go back to work, you just need to relax until I tell you what to do. Until we get you stable, ma'am, we're not – we're not doing this with your health".

Since 2012, Plaintiff has had periods where relapses have significantly affected her health. Since Plaintiff was diagnosed with MS, Plaintiff has had impairments to her cognitive thinking, including short-term memory loss, "off and on". She describes this as "you know what you want to say but your mind drops it."

<h3 style="text-align:center">Summary Judgment Standard</h3>

The Eighth Circuit has articulated the appropriate standard for consideration of motions for summary judgment, as follows:

> Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. The movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of

material fact. If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Torgerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir.2011) (en banc) (internal citations and quotation marks omitted). "Although the burden of demonstrating the absence of any genuine issue of material fact rests on the movant, a nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial." *Wingate v. Gage Cnty. Sch. Dist., No. 34,* 528 F.3d 1074, 1078–79 (8th Cir.2008) (cited case omitted). With this standard in mind, the Court accepts the stated facts as true for purposes of resolving the parties' motions for summary judgment.

## Discussion

The ADA makes it unlawful to discriminate against a "qualified individual with a disability" because of the disability. *Bahl v.Cty of Ramsey,* 695 F.3d 778, 83 (8th Cir. 2012). In order to establish disability discrimination under the ADA, Plaintiff must first show that she "(1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) suffered an adverse

employment action because of her disability." *Walz v. Ameriprise Fin., Inc.,* 779

F.3d 842, 845 (8th Cir.2015). Here, the parties dispute whether Plaintiff is a

"qualified individual."

> To be considered a qualified individual under the ADA, an employee must "(1) possess the requisite skill, education, experience, and training for [her] position, and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Hill v. Walker,* 737 F.3d 1209, 1216 (8th Cir.2013) (quoting *Fenney v. Dakota, Minn. & E.R.R. Co.,* 327 F.3d 707, 712 (8th Cir.2003) (alteration in original)). "Discrimination includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].' " *Dropinski v. Douglas Cty., Neb.,* 298 F.3d 704, 707 (8th Cir.2002) (quoting *Heaser v. The Toro Co.,* 247 F.3d 826, 830 (8th Cir.2001)) (alterations in original).

*Scruggs v. Pulaski Cty., Ark.,* 817 F.3d 1087, 1092 (8th Cir. 2016).

"Essential functions are the fundamental job duties of the employment

position." *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 845 (8th Cir. 2015) (internal

quotations omitted). The determination of whether an individual is qualified for

purposes of the ADA should be made as of the time of the employment decision.

*Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1047 (8th Cir. 1999).

To survive summary judgment, Plaintiff must show she was able to perform

the fundamental job duties as a senior consultant. "Although not conclusive, we

consider the employer's judgment of what constitutes an essential function 'highly

probative.' *Kammueller v. Loomis, Fargo & Co.,* 383 F.3d 779, 786 (8th Cir.2004)

(quoting *Alexander v. Northland Inn,* 321 F.3d 723, 727 (8th Cir.2003)). *Scruggs* 817 F.3d at 1093.

This position required Plaintiff to handle customer calls regarding sales and service, responding to customer requests or inquiries about services, products, and billing, making notations via computer terminal, utilizing different mechanized systems to initiate and complete service orders, working to meet revenue goals, service commitments, and other deadlines and wearing a headset.

Plaintiff argues Defendant failed to accommodate her. It is Plaintiff's burden to make "a facial showing that a reasonable accommodation would enable her to perform her essential job functions." *Dropinski v. Douglas Cty., Neb.,* 298 F.3d 704, 709 (8th Cir.2002).

At the time Plaintiff and her union representative met with representatives from Defendant, Plaintiff's restrictions were no headset and no typing other than to log on and off the computer. Plaintiff claims Defendant failed to accommodate her by not allowing her to use a voice-activated system. Defendant researched these possibilities and found that the voice-activated system still requires some computer use, and it was not compatible with its software. Regarding the no headset issue, Defendant considered a speakerphone and determined that it was not feasible based on privacy concerns and distractions.

An employer is not required to provide the specific accommodation requested or preferred by an employee. *Cravens v. Blue Cross & Blue Shield of Kan. City,* 214 F.3d 1011, 1019 (8th Cir.2000). Rather, an employer only has to provide an accommodation that is reasonable. *Id.* Plaintiff's proposed accommodations were not reasonable in that the voice-activated system would still require Plaintiff to do some typing and the speakerphone had privacy and distraction issues.

Even if the Court were to find that using these accommodations were reasonable accommodation under the ADA, Plaintiff did not carry her burden to show that she could perform the essential functions of her job with that accommodation. *See Alexander v. Northland Inn,* 321 F.3d 723, 727 (8th Cir.2003)) (it is the ADA plaintiff's burden to show that she could perform the essential functions of her job with a reasonable accommodation). Plaintiff has presented no evidence that her doctors cleared her for work; all of the medical records indicate that her doctors in fact advised her not to work, and she was on short term (and later long term) disability because of her MS, which precluded her from working. "The ADA does not require an employer to permit an employee to perform a job function that the employee's physician has forbidden." *Id.* It is not reasonable to expect an employer to disregard an employee's treating physician's

opinion expressly imposing physical restrictions. *Id.* Plaintiff has failed to show that a reasonable accommodation was available.

Plaintiff argues Defendant failed to engage in an interactive process to determine whether a reasonable accommodation was possible. But "[u]nder the ADA, if no reasonable accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process." *Battle v. United Parcel Serv., Inc.,* 438 F.3d 856, 864 (8th Cir.2006). As outlined above, Plaintiff did not meet her burden to show there was a reasonable accommodation available that would not place an undue burden on Defendant. *Scruggs*, 817 F.3d 704, 707, (citing *Dropinski,* 298 F.3d at 710).

Plaintiff also sought a possible reassignment. The Eighth Circuit has recognized that reassignment may not be required of employers in every instance, but under certain circumstances, may be necessary as a reasonable accommodation. *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1018 (8th Cir. 2000). The scope of an employer's reassignment duty is limited by certain constraints. *Id.* at 1019. For example, the position sought by the employee must be vacant. *Id.* An employer is not required to 'bump' another employee in order to reassign a disabled employee to that position." *Id.* In addition, the employee must be otherwise "qualified" for the reassignment position. *Id.* "To be considered qualified for this job, the individual must satisfy the legitimate

prerequisites for that alternative position, and...be able to perform the essential

functions of that position with or without reasonable accommodations ...." *Id.*

(internal quotations omitted).

In this case, Plaintiff was looking for a clerical job and she was given a

binder of jobs.  She filled out two documents titled "job vacancy request."  She

listed the job titles and interest in Missouri and the St. Louis metropolitan area.

Plaintiff was contacted to undergo testing for a premises technician position, but

did not pass.  She was unable to secure an open position for which she was

qualified, with or without accommodation.   There were no positions open within

Defendant's business for which Plaintiff was qualified, with or without

accommodation.

## Conclusion

Based upon the foregoing, the Court concludes that Plaintiff has failed to

establish that she could perform the essential functions of her job, and therefore

was not a "qualified individual" under the ADA.  Defendant is entitled to judgment

as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary

Judgment, [Doc. No. 66], is **GRANTED**.

A separate judgment in accordance with this Opinion, Memorandum and

Order is entered this same date.

Dated this 26th day of December, 2017.


/s/ Henry Edward Autrey
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE